20-1006 National Lifeline Association Petitioner v. Federal Communications Commission and United States of America. Mr. Heitman for the petitioner, Ms. Flood for the respondents. Good morning, Mr. Heitman. Please proceed. Good morning, Your Honors, and may it please the Court. I'm John Heitman, appearing today for Appellant National Lifeline Association for NALA. I'd like to reserve two minutes of my time this morning for rebuttal. My focus today will be on the plain language of three FCC rules to demonstrate that the order is not in accordance with the FCC's own rules and therefore violates the APA. The Supreme Court's Kaiser decision makes clear that an FCC order that runs contrary to its own rules is not entitled to any deference. The nonreimbursement order must be vacated because it's not in accordance with the plain as 407A. The order also cannot be squared with the plain text of rules 407C2 and 405E3. I'll now walk Your Honors through the plain text of each of these rules so that I can demonstrate that there is only one reasonable construction of these rules, and it is that carriers are entitled to support for lifeline service provided to subscribers for whom the first day of the month. You can find the text of the relevant version. Before we get to the merits, can I ask you about your standing in this appeal? Yes. So, what exactly is the theory of standing for your organization? Is it based on increased administrative burdens, or is it based on the harms in the Dorwart Declaration? Your Honor, I would say it is based on both, right? NALA is the industry association that represents a group of providers and carriers in the lifeline program. And so, its members join NALA so that they can join together, and it represents its interest, just like many other industry associations before the agency. And so, NALA itself is burdened because NALA now has to shift resources to this appeal, and to this case, as opposed to doing other things that NALA would do for its members. The members of NALA are also burdened because they have a going-forward burden of not being able to receive reimbursement for the lifeline discounts provided to consumers going forward. But more importantly, perhaps, is that they have… But they do get reimbursement if a subscriber actually uses the service during the cure period. They're able to seek an adjustment. So, they do get paid. It's just a question of the timing of the payment. Yes, Your Honor, if the subscriber cures during the cure period. But this is a case about a subscriber who is in the cure period and has not cured, and they have 15 days to cure. So, we cannot know. Go ahead. The Declaration focuses on the harm of not being reimbursed for someone who does cure. Actually, I would have to pull the Declaration, Your Honor. But the case, and we have briefed the case, and we have certainly made clear to the court that there are harms going forward in not being reimbursed. What are those harms specifically, though? The harm is that the subscriber for whom we provide service to during the cure period, we provide service to. And if we don't get reimbursed, our reimbursement goes from up to $3425 down to $0 by virtue of the FCC's rule. And not only does it go down to $0 presently for customers we serve, it goes down to $0 for customers we serve in the future. But perhaps more importantly, we have a massive retroactive liability exposure that has happened here because of the FCC's change in its view on the rule when it ruled on the NALA petition back at the end of last year. So under the FCC's change, the FCC, who had been paying reimbursement for subscribers in their cure period, because we have to provide service to them, Your Honor. We have to provide discounted and lifelike service to them, and the FCC is reimbursing them. I guess what I'm not seeing in the record, though, is what is the cost of providing a service that is not used? I mean, the FCC at cost is de minimis or non-existent. And I guess I'm not seeing in the record what the cost is to the providers who are providing a service that's not being used. Yes, Your Honor. First and foremost, this case is about Lifeline, which is a discount program, right? The Lifeline program provides us with a reimbursement for a discount. So we lose on every subscriber up to $34.25 a month that we have not charged a subscriber because the federal government provides that to us in support. So that is the amount of key economic metric. That's the key harm right there in losing that $34.25. Now, you asked about the cost of service. I think it doesn't, frankly, matter for this reimbursement question. It matters, perhaps, for the takings question. But the cost of service is this. We have to provide and allocate a bucket of minutes, text, and data every single month to every subscriber, including those who are in the non-use of cure period. So we have to buy a provision and allocate that bucket of service to that subscriber, just the same as we have to allocate it to another subscriber who uses all of it, another subscriber who uses some of it. Our cost, think of it like a hamburger we put on the table, right? If I put a hamburger on each of your judges' tables and Judge Rao, you eat none of it, and Judge Edwards, you eat half of it, and Judge Cassis, you eat all of it, my cost in serving that hamburger is the same thing. I can't take it back, and I can't re-serve it to somebody else, not the same month or even the next month. I bought that service, and I use it or I lose it. It's just like you're eating it. By capacity, user by user? But we allocate chunks or buckets, as they're called, Judge, by user. And so we lose up to $34.25 in reimbursement every single month for every subscriber, and we are unable to recover our cost in serving those subscribers. But I would submit to you the more important element for this appeal is the fact that we lose that $34.25, up to $34.25, and we had been being paid it for serving these customers in their cure period for years until the non-reimbursement order was adopted. So I want to actually go quickly, if I can, through these rules, and I want to start with 407A. Because 407A says, by its plain language, universal service support shall be provided directly to eligible telecommunications carrier based on the number of actual qualifying low numbers it serves directly as of the first day of the month. 407A was amended in 2015 to include that concept of service as of the first day of the month. We call it the snapshot date. It is important because the FCC, at that point in time, filled the regulatory gap. Prior to that point in time, there was no date upon which a carrier had to count all of its customers for the purpose of submitting reimbursement claims. This rule clarified everything for the carrier and for the administrator. This is the date it is done. We take a snapshot of who you serve on the first of the month, and that is who we reimburse. So the plain text of 407A says, support shall be provided to carriers based on the number of customers it serves as of the first day of the month. 407A contains no other limitation, and importantly, it contains no exemption to a carrier's right to receive reimbursement for a customer who is in the non-usage cure period, or any cure period for that matter. Will 407C2 carve out an exception? Your Honor, I would submit to you respectfully that it does not in this case. It does not carve out an exception for subscribers for whom the 15-day non-cure period has not ended. And so if I can't explain, 407C2 doesn't have that exemption. The plain text says, a carrier shall only continue to receive universal service support reimbursement for such lifeline service provided to subscribers who have used the service within the last 30 days or who have cured their non-usage provided for in 405E3. By its terms, 407 says something about a carrier's right to continue to receive support. The word continue is important. It indicates that support is already being provided and that at some point in the future, it will only continue to be provided if something happens. Specifically, 407C2 says that a carrier shall only continue to receive support for subscribers who have cured their non-usage as provided for in 405E3. That's important because the rule says it's about what will happen going forward if and when a subscriber cures her non-usage as governed by 405E3. We take a look at 405E3, and the relevant text says, if a subscriber fails to use as usage is defined in 407C2 for 30 consecutive days, an eligible telecommunications carrier must provide the subscriber with 15 days' notice using clear, easily understood language that the subscriber's failure to use the Lifeline service within the 15-day notice period will result in termination. So rule 405E3, by its plain terms, says that if a subscriber fails to use within 30 days, a carrier has to provide 15 days' notice to that subscriber, and he or she has 15 days in which to cure their non-usage. That's very important because the reference to 405E3 contained in 407C2 tells us that we cannot know. We cannot know under 407C2 which subscribers will have cured their non-usage as provided for in 405E3. We can't know it until 15 days have passed. Yes. Yes. Yes, but they have not had their 15 days to cure, and the reference in 407C2 goes to 405E3, which provides subscribers with 15 days to cure. If we were talking about a user in the cure period. Yes, we are. And I simply asked a question, and he hasn't yet cured. You asked the question, has that user cured? The simplest correct answer would be no, and the elaboration on that answer would be yes. It may be that that person has some number of days in which he might cure in the future, but he hasn't done it yet. That's right, Your Honor, but the language of 407C2 is implementing a non-usage rule that gives consumers 30 days to use and 15 days to cure. It's a 45-day period, and the rule plainly says carriers will only continue to receive support after this 45-day period if the consumer uses or cures. It doesn't say what happens during the 15-day cure period. If it did say that, you would have to strike several words out of it, and I think sort of the FCC effectively does in its order. I think if it said what the FCC said it says, I think you would have to strike the words only continue to out of 407C2, and I think you would have to add the word not a couple times. You'd have to say instead of saying to Lifeline subscribers, to subscribers who have used the service, I think you would have to insert the word not, who have not used the service. Likewise, instead of or have cured their non-usage, I think you would have to say or have not cured their non-usage, but that's not the plain language of this rule. The rule contains those words. It's not phrased with nots. I'm not following that because two conditions are imposed on not on losing the right to receive reimbursement but on continuing to receive reimbursement. You can continue to receive reimbursement if the person has used the service or has cured the non-use. Right, and we have asserted and the FCC has agreed and they're briefed with us on page 23 that these customers who are in their 15-day cure period and have not cured are in neither of these two buckets. Because they are in neither of these two buckets, this rule does not apply to them. This rule is carefully worded. It does not apply to them, and because it doesn't apply, 407A's language applies. There is a way to read all three of these together, Your Honor, and it is at the point in time in which the 15-day cure period ends. And at that point in time, if the consumer still has not cured their usage, then they are terminated under 405E3. And then the carrier's right to continue to receive support for them ends, it ceases, under 407C2 and under 407A. That is the way you read these three rules together. Mr. Hyman, I'm interested in your argument that you're saying the people who are in the cure period but haven't cured are not encompassed within 407C2, right? Because 407C2 says after service activation, an eligible telecommunication carrier shall only continue to receive service support for these two categories, right? The people who have used it or who have cured it. So by saying that it's outside of that, I think you're admitting that you don't get the reimbursement because you only get universal support reimbursement if you fall under one of these two categories. And you're saying that you're in a place that doesn't fall within one of those two categories. So I think that's to admit that you don't get reimbursement. Is that? Your Honor, I'm not admitting that. And I think what you have to look at is the reference to 405E3. That reference is there for a reason. And it says as provided for in 405E3. And 405E3 provides 15 days, 15 days in which to do this. And so until that 15 days is up, I submit to you that 407C2 by its plain terms does not apply. And that 407A does apply. When the 15 days is up and the subscriber doesn't cure, then they get terminated under 405E3. And they're not entitled to reimbursement under 407C2 and 407A. But that doesn't happen, Your Honor, until they are terminated and until their non-usage cure period is expired as provided for in 405E3. How does the 15 days go to this question of whether they have cured their non-usage? They have 15 days in which they could do it, but whether they're on day one or day 15, if they have not cured it, then you can't get reimbursement. I think, Your Honor, I think you cannot read out the 405E3 reference. You cannot read out from the rules here the 15 days that are provided for in 405E3. It says as provided for in 405E3. It doesn't end with just non-usage. The statute and what you're suggesting is perhaps to strike the words as provided for in 405E3, and I think the FCC would like that. But that's not the rule they wrote. The rule they wrote contains that reference, and that reference means that subscribers get 15 days to cure. And by the way, these rules require us to provide that service to these subscribers during that period. We provide that discounted service to these subscribers to that period for two reasons. One, so they can cure, and two, because there's a benefit to them. There's a benefit from being able to pick up the phone and call emergency services or go online and find a job. There's a benefit to this that we provide to these subscribers even during the 15-day cure period. So I think if you look at the language that is provided to you in 407C2, and there's a lot of it, you have to look at the reference to 405E3, but you also have to resist the temptation to insert the nots that the FCC has asked you to insert into this rule that they did not write into it when they wrote it. They did not say shall not receive. They did not say have not used. They did not say have not cured. That's not what this rule says. That's not what the plain text of the rule says. You can read these three rules together. The FCC, by doing this work on 407C2, has no explanation for the reference to 405E3 and has no explanation for why 407A sits as it is with that mandate. There's no specific versus general conflict here, none whatsoever. The three rules can be read in perfect harmony. And so that's what I asked the court to do because that is what had been done for years, for years, up until the point the non-reimbursement order was adopted. Thank you, Mr. Heitman. Judge Edwards, any questions? No, thank you. Thank you, Your Honors. Ms. Holmes. Ms. Flood. Thank you. Good morning. May it please the court. Maureen Flood from the Federal Communications Commission. I agree with Mr. Heitman that this case is governed by the text of the commission's rules, and the commission's interpretation of the rules in the order is the only reasonable one. Subsection A of Rule 54.407 establishes how an ETC's baseline lifeline reimbursement amount shall be determined, and then Subsection C2 is a specific restriction on that general rule. It provides that after an ETC activates service, it shall only continue to receive support for subscribers who have used the service in the past 30 consecutive days or who have cured their non-usage problem. If a subscriber does not fall into one of those two categories, the ETC will not continue to be reimbursed. What about 405E3? 405E3 establishes a process by which an ETC has to provide notice of the opportunity to cure the non-usage problem before de-enrollment, but it says nothing about reimbursement. Reimbursement is handled by 54.407A. What Petitioner is trying to do here is raise some sort of temporal restriction in Subsection 54.407C2. It doesn't include one. If a subscriber does not fall into one of those two categories on the snapshot date, the ETC shall not continue to receive support for that subscriber. E3 only adopts or it only establishes this notice period during which the subscriber can cure, but it has nothing to do with reimbursement. The reference to E3 in Subsection C2 is only acknowledging the cure period, the 15-day notice period during which the subscriber can cure, but it doesn't say that the ETC can claim reimbursement for the subscriber while they are in that 15-day cure period. And, again, that has been the case since 2012. Petitioner, well, ETCs before the Age Disney Act even acknowledged that they could not claim support for subscribers in the cure period on the snapshot date. When the Commission adopted the snapshot date in the 2015 Lifeline Order, it did so to mitigate ETCs reporting burdens by establishing a single date on which they would submit the line counts used to determine their general reimbursement support amount. But nothing in the 2015 Lifeline Order mentioned Subsection C2, the non-usage restriction, let alone amended that restriction so that ETCs could now claim support for subscribers in the cure period if that cure period fell on the snapshot date. Ms. Flood, so what about the administrator of the USAC providing guidance in a different direction from what the FCC is arguing now? Your Honor, the fact that the Lifeline administrator misinterpreted the Commission's rules does not mean that the Commission's rules are unreasonable. The plain text of the rules since 2012 have stated that an ETC cannot claim Lifeline reimbursement for a subscriber in the cure period for non-usage. But, Dean, isn't the FCC responsible for ensuring that the guidance given by the administrator is accurate? Is it not, right? Because the administrator can't make any new substantive rules or issue guidance contrary to the rules, as you say. But that guidance was allowed to stand on its website. Your Honor, what happened here, you're correct. The Commission is responsible for making sure that the Lifeline administrator follows our rules. But here, the Lifeline administrator made a mistake. And that happened. That's what happened in the Sollins Academy case that the Commission relied on in the Order on Review and is discussed in the briefs. Unfortunately, the Lifeline administrator will make mistakes from time to time. It put the incorrect guidance, which is one sentence, on its website in December 2016. That guidance was revised in December of 2017. So at least since December of 2017, ETCs should not have been claiming support for subscribers in the cure period for non-usage. And I'm perplexed by the assertion made by Petitioner's Counsel that ETCs face years of retroactive liability here, given that they should have known since December of 2017 that they should not be claiming support for those subscribers. If they're going to rely on guidance from the Lifeline administrator that they'd like, they also have to rely on guidance from the Lifeline administrator that they might not agree with. You know, I'd also point out, and we raised this this year, we cite the petition at page 39 of our brief. But in 2016, a group of ETCs filed a waiver petition with the Commission that asked the Commission to waive the non-usage rules so that they could collect Lifeline reimbursement for subscribers in the non-usage cure period on the snapshot date. In other words, their understanding of the Commission's rules was the same as the Commission's in the order on review. So given that they understood the rule to deny reimbursement, and given that the rule since 2012 has denied them reimbursement for subscribers in the non-usage cure period, when the Lifeline administrator posted that incorrect guidance on its website, ETCs should have followed the plain text of the rules, particularly given that they understood the rules. But isn't the—I mean, the core point that they're making is there a group of subscribers for whom they will never be reimbursed, even though they're required to give service. They've got to make an investment. That is their argument, Your Honor. But isn't that correct? That is correct. There are some subscribers, if the subscriber is in the cure period, and they don't cure their non-usage problem, then ETC will not be able to claim reimbursement from them. Even though they have provided service? Your Honor, the non-usage rule in subsection C-2 is not concerned with the provision of service by an ETC. It's concerned with usage. It talks about usage. No, no. We're talking about getting the equivalent of reimbursement or getting the support you would otherwise get. That's correct, Your Honor. But, again, this case is determined by the rules. And so here are the text of rules of subsection C-2. But that—respectfully, counsel, that doesn't make sense. That's like saying if we have a rule that says we're just not going to reimburse you, then you lose because we have a rule that says we're not going to reimburse you. I'm trying to understand. They're saying that they are required to give service even during this non-usage period. They are required to give service by your rules. And they're saying, as I understand it, it makes no sense for them not to receive reimbursement for a period when they were required to give service. Right. My response to that, Your Honor, is the commission made the determination that they have to provide service in that period in 2012 when the commission adopted subsection C-2 and the 2012 lifeline order. And there are good policy reasons for that. When the commission adopted the non-usage rule, it did so because it didn't want to waste— You mean they weren't getting reimbursement beginning in 2012? That's correct, Your Honor. That is correct. In 2012, the commission adopted the non-usage rule in 2012. And in 2012, the non-usage rule said that—subsection C-2 of the rule said that lifeline since 2012, the non-usage rule in subsection C-2 has provided that lifeline ETCs cannot claim reimbursement for subscribers in the cure period for non-usage. Nothing in that rule has changed. The crux of Petitioner's argument is that when the commission inserted the snapshot date in subsection A in the 2015 lifeline order, all of that changed. The ETCs subsequently could claim support for subscribers in the cure period for non-usage on the snapshot date. So, in other words, their argument is key to the adoption of the snapshot date. But the non-usage rule, which focuses on usage, usage by the customer, and that service has been in effect since 2012. And our point is that if the commission adopting the snapshot date intended to redefine what is reimbursable under subsection C-2, we probably would have mentioned subsection C-2 in the 2015 lifeline order and explained why we were effectively amending that rule, but we didn't. The snapshot date, which is the key to Petitioner's argument here, was simply adopted by the commission to mitigate the reporting costs on ETCs when they filed their reimbursement claims. It has nothing to do with what is reimbursable. Ms. Flood, do you agree with Mr. Heitman's hamburger analogy, right? Is the FCC effectively saying that these ETCs have to provide a hamburger whether or not somebody eats it? And if someone doesn't eat it, then... That's the same thing I'm asking, exactly. That's certainly my understanding. I didn't hear you say anything to the contrary. No, and that has been the case since 2012. But I would point this out. In the order of review, the commission considered the argument that the Petitioner put in the record, that that burden is significant and unfair. And the commission found very little evidence in the record that the impact of that rule, again, a rule that has withheld support for ETCs, from ETCs for subscribers in this period of time since 2012, but the commission found that that burden would be light. There was no evidence in the record about the amount of costs that ETCs would incur. There was no evidence in the record about the number of subscribers who are in the cure period for non-usage in the typical month. And so the commission, and as the court pointed out, an ETC is reimbursed if the subscriber eventually cures its non-usage problem. So there was no evidence in the record to contradict the commission's determination that the burden of providing an unused service for at most a period of 15 days would be anything other than light. Ms. Flood, to the extent that the non-reimbursement order is, if we assume that the non-reimbursement order was consistent with the rules, as you suggest, then can the petitioners challenge, I mean, they're not able to challenge the merits of the underlying rules at this point, are they? No, really what petitioners, and we make this point in our brief when we talk about this issue about the impact on ETCs, but effectively in arguing that our interpretation of the rules places this undue burden on ETCs, that is an untimely collateral attack to the 2012 lifeline order, because that's when the commission adopted the non-usage restriction in subsection C2, and since 2012, ETCs have not been able to claim reimbursement for subscribers in the period of non-usage. And the interesting thing is, we did not hear these complaints from ETCs until the commission adopted the snapshot date in 2015. But again, the snapshot date has no bearing at all in subsection C2. Wait, let me make sure I'm following you, but I did think about this following you on this argument on finality or reviewability, whatever you're suggesting. My understanding is they petitioned for a declaration, right? And the commission issued an order in response to that and gave the interpretations that are now subject to our consideration, right? Correct. That's a final order that's reviewable, because there was confusion about what had gone up on the website. I would agree with you if there's nothing more than interpretive rules being thrown on the website, there's a question about reviewability. But they filed a declaration. You could have said we're not responding. The agency did respond, and they responded with a final order and gave these interpretations, which we're now considering. That's reviewable. What am I missing? Your Honor, our point is that the policy determination about where to make the cut in terms of the policy cut that ETCs cannot claim support for those subscribers was made in 2012. I understand you're arguing about the rule. You switched in response to Judge Rao to suggest maybe this isn't even reviewable, and I'm not following that at all. You did not have to issue a reviewable order, but the agency did. Your Honor. Right? Okay. Your argument is that the order we issued is reasonable and certainly consistent with what we think we've always meant. But we agree there was confusion, so we took the petitions for declaration, and we responded. And what we're doing, we think, is consistent with what we've always done. That's your argument, right? Yes, that is very well put. That is my argument. But that's a reviewable order. That is a reviewable order. You said that the snapshot date has nothing to do with this. This is all just about C2. But I'm not sure that's right. And as I understand this, if the carrier, if a subscriber didn't do anything for, if the subscriber didn't use the service for 30 days and the carrier cut the service off on day 31, that would be unlawful under this scheme, correct? Yes. The carrier has to provide a 15-day notice before cutoff. So you're imposing on the carriers this affirmative obligation to continue providing service after a 30-day period of non-usage. And then you say in 407A, support is based on the actual customers served directly as of the first date of the month. And for a while I was wondering if someone who hadn't used the service in 30 days might not be an actual qualifying customer, but under this scheme on day 31 through 45, whatever it is, they still have this legal obligation to continue providing the service. And the snapshot date seems to treat them as actual qualifying customers as of that, if they're in that status on the first date of the month. That's correct, Your Honor. The way the rule works is... So if we just had 407A, the snapshot date strengthens the petitioner's case, correct? Yes, if there was no subsection C2. And that is at least some reason for trying to construe 407C2 and 405E3 in harmony with that. I mean, you're right, specific qualifies the general, but before we get to that, we try to harmonize all provisions so that there's no conflict to begin with. Correct, Your Honor, but the problem with that reading of subsection A is that it renders subsection C2 superfluous. And we walk through the example on pages 23 and pages 24 of our brief, but effectively what petitioners are arguing is that subsection C2 is prospective only. In other words, it only eliminates support for subscribers once they've been de-enrolled from the Lifeline program. The problem with that is that subsection A already does that. Because if a subscriber is de-enrolled for non-usage, let's say in the middle of April, that subscriber pursuant to subsection A is not going to show up on the snapshot date under subsection A in the next month. So prospectively, the Lifeline E2C doesn't get reimbursement. Subsection C2 only performs work if pursuant to the second factor in subsection C2, it also eliminates support for the subscriber in the non-usage cure period on the snapshot date. In other words, subsection C2 only does any work if it eliminates support for two months in step one. And then I go back to the fact that subsection C2 doesn't have any sort of temporal restriction. I understand that petitioners don't like the construct that the commission came up with, but our interpretation of the rules is truly the only way to reconcile A and C2, because it's the only interpretation that actually gives effect to subsection C2. Okay. Judge Rao, anything else? No. Judge Edwards? Nothing more, thank you. Thank you, Ms. Flood. Does Mr. Heitmann have any time? Council was out of time. We'll give you two minutes. Thank you, Your Honor. Judge Cacheson, in response to your question about qualifying customer, it's defined in Rule 4 or 9, a qualifying customer is an eligible customer. So the fact that a customer is in a non-usage period does not make them a non-qualifying customer. They are a qualifying customer. Now, with respect to going back to 2012, the rules 407A, the core of it, that says you shall be reimbursed, and the core of the non-usage rule, 407C2, have been the same. They have been adjusted in 2015 to adjust the snapshot date into 407A, and the non-usage period has been condensed down from 30 to 15 days in 407C2. And so it is the case that, based on the plain language of these rules, carriers have, in fact, been claiming reimbursement for subscribers served in the cure period for a long time. We said so in our brief. The FCC said it would only go back to 2016 in their brief, so in our reply brief, we said fine. If we're only going to be exposed back to 2016, we'll agree to that. But the fact of the matter is there's exposure that goes behind that. And in 2016, you're right. It did crystallize for us because, as I explained, the 2015 snapshot idea crystallized the timing impact, right? It says 407A happens on a day, right? What you've not heard yet from counsel from the FCC is what 405E3 means and what the reference to 405E3 means in 407C2. And it means that we have 15 days, so you have that 15-day period colliding with this one day. And the only way that you give all three of these rules meaning is that you pay the carriers reimbursement for subscribers for whom the cure period has not ended, but they are still served as the first day of the month. You give all three rulings, all three rules meaning to the FCC's effect on day 16. On day 16, when the subscriber has not cured, they are terminated under 405E3. The carrier no longer has the right to continue to receive reimbursement under C2, and they don't get reimbursement under A. Thank you, Your Honors. Thank you, Counsel. Case is submitted.
judges: Katsas, Rao, Edwards